IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HARRIS "MAC" CARMICHAEL, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:11-CV-1110-MEF |
| ) | (WO – Publish) |
| SAXON MORTGAGE SERVICES, ) | |
| INC., ) | |
| ) | |
|     Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Harris "Mac" Carmichael ("Carmichael") brings this action against Defendant Saxon Mortgage Services, Inc. ("Saxon") alleging Saxon initiated foreclosure proceedings on Carmichael's home although he had been making timely payments under a repayment agreement. This case is before the Court on Saxon's Motion for Summary Judgment (Doc. #38). Having considered the arguments of counsel, the evidentiary submissions, and the record as a whole, the Court finds that the Motion is due to be GRANTED IN PART and DENIED IN PART.

### **I. JURISDICTION AND VENUE**

The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332. This case was originally filed in the Circuit Court of Montgomery County, Alabama, and it was properly removed by Saxon to this court on December 27, 2011 (Doc. #1) pursuant to 28 U.S.C. § 1441. The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

1

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine dispute of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [her] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations omitted). To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A plaintiff must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary

2

judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### III. FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to Carmichael, as the non-moving party, establish the following material facts. In 2005 Carmichael took out a home mortgage and loan that was subsequently assigned to Saxon, who became the servicer of the loan. After Carmichael fell behind on his payments, he contacted Saxon in 2010 to discuss arrangements for repayment of the loan. Carmichael entered into a Formal Repayment Plan ("Repayment Agreement") with Saxon. The Repayment Agreement required Carmichael to make monthly payments for one year that included an arrearage amount added to his monthly mortgage payment to make the account current at the end of the plan. The Repayment Agreement provided as follows:

> 2) FORBEARANCE PAYMENTS. All payments described hereunder shall be made by cashier's check and/or bank wire. If paying by cashier's check, payments MUST be mailed to the following address:
>
> SAXON MORTGAGE SERVICES, INC.
> 3701 REGENT BLVD., Suite 200
> IRVING, TX 75063

> The payments must be received by the Date of Payment as noted below.

(Doc. #40, Ex. 1.) The payment schedule required Carmichael to make a payment on June 16, 2010, and thereafter on the first day of the month from July 1, 2010, until May 1, 2011. The Repayment Agreement specifically provided that Saxon must receive all payments under the plan by these dates, and that payment must be in the form of a cashier's check or wire transfer. The Repayment Agreement also contained a "No Waiver" clause, which provided that, during the repayment period, Carmichael was deemed still in default of his original mortgage and that Saxon retained the power of sale from the original mortgage. (Doc. #40, Ex.1, ¶ 4.) The "No Waiver" provision further stated that "[u]pon any breach of this Agreement, Noteholder [Saxon] may, at its sole option, continue with the foreclosure action currently in place." (Doc. #40, Ex. 1, ¶ 4.)

It is undisputed that Carmichael made all payments under the Repayment Agreement until December 2010. Carmichael claims that he tendered a check to Saxon on November 26, 2010, for the December 1, 2010 payment. (Doc. #40., Ex. B.) Indeed, Carmichael's personal check #1322 is dated November 26, 2010, made payable to the order of "SMSI Wire Clearing Acct. 4121837207," and includes his Saxon account number in the memo line. (Doc. #40, Ex. 2.) However, there is no dispute that this check was not sent to Saxon, but was deposited at a local branch of Wells Fargo directly into Saxon's wire clearing account. (Doc. #40, Ex. A, ¶ 9.) The wire clearing account is used for incoming wires and not for mortgage payments made by check. In addition, the deposit into the wire clearing account was not made until December 7, 2010 and was made by personal check. Since the payment

4

was deposited into the wire clearing account, Saxon was unable to determine the purpose of the deposit and returned the funds to the issuing bank. (Doc. #40, Ex. A, ¶ 12.) Bank records show that the funds debited via check #1322 were credited back to Carmichael's account on January 28, 2011, with the description "misapplied check." (Doc. #40, Ex. C.)

Carmichael attempted to make a payment on January 4, 2011, by wire transfer, but Saxon was unable to identify the payment because the customer name on the wire was "Mac Carmichael" when Carmichael's loan was in the name of "Harris Carmichael;" the customer address on the wire was different from the property address and mailing address associated with Carmichael's loan; and the loan number was not listed on the wire information received from Carmichael's bank. (Doc. #40, Ex. A, ¶ 13; Doc. #40, Ex. 3.) After the January wire transfer was returned, Carmichael contacted Saxon, who informed him that neither his December 1, 2010 nor his January 1, 2011 payments had been made. (Doc. #1-2, ¶ 21.) Carmichael sent a fax to Saxon on January 12, 2011, formally disputing Saxon's claim that he had failed to make his December 1, 2010 and January 1, 2011 mortgage payments. (Doc. #42-1, 3.) This dispute letter contains a copy of Carmichael's personal check #1322 and a statement from his bank showing the check had cleared. (Doc. #42-1, 3-5.) Carmichael also refers to check #1322 in the dispute letter as one that he "mailed" to Saxon on November 26, 2010, whereas it was actually deposited at Wells Fargo into Saxon's wire clearing account. (Doc. #42-1, 3.) Saxon responded to Carmichael's January 12 dispute letter with a letter dated January 13, acknowledging the dispute letter and stating that an investigation had begun into Carmichael's claims. (Doc. #1-2, ¶ 25.) Saxon provided no further written response to Carmichael's dispute letter aside from an account statement on March 31, 2011,

5

showing the December 2010 and January 2011 payments had not been credited to Carmichael's account. (Doc. #42-1, 19-25.)

The record becomes sparse at this point. It appears that a foreclosure sale scheduled for the end of January was canceled after Carmichael retained counsel. (Doc. #1-2, ¶ 32.) Carmichael alleges that, over the course of 2011, Saxon failed to respond adequately to his repeated requests that Saxon credit the December 2010 and January 2011 payments to his account. (Doc. #1-2, ¶¶ 33-42.) But the record is devoid of any evidence of the frequency and nature of these communications other than hearsay statements by Carmichael's counsel contained in e-mails sent to Saxon and its counsel. After Saxon notified Carmichael that a foreclosure sale was scheduled for his home on November 15, 2011, he commenced this action in Montgomery County Circuit Court. Saxon removed the case to this Court and moved for summary judgment on all Counts alleged in Carmichael's complaint.

## IV. DISCUSSION

Carmichael brings eleven[1] claims against Saxon: (1) negligence (Count 1); (2) fraud (Count 2); (3) wantonness (Count 3); (4) breach of contract (Count 4); (5) "attempted" wrongful foreclosure (Count 5); (6) breach of implied covenant of good faith and fair dealing (Count 6); (7) slander of title (Count 8); (8) intentional infliction of emotional distress (Count 9); (9) violation of the Alabama Deceptive Trade Practices Act (Count 10); (10) violation of the Real Estate Settlement Procedures Act ("RESPA") (Count 11); and (11) defamation and damage to credit reputation (Count 12). In his response to Saxon's motion for summary judgment, Carmichael does not oppose, or even address, Saxon's motion as to Count 5

---

[1] There is no Count 7 alleged in Carmichael's complaint. (Doc. #1-2, Ex. A.)

("attempted" wrongful foreclosure), Count 6 (breach of implied covenant of good faith and fair dealing), and Count 9 (intentional infliction of emotional distress). (Doc. #42.) Thus, the Court deems these claims abandoned and due to be dismissed. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted). As to the remaining claims, the Court finds that there is no genuine dispute of material fact as to Counts 1–4, 8, 10, and 12 of Carmichael's complaint, and that Saxon is entitled to judgment as a matter of law on these Counts. However, the Court finds that a genuine dispute of material fact does exist as to Count 11 of Carmichael's complaint, and summary judgment would be improper as to that Count.

**A.     Breach of Contract (Count 4)**

Carmichael asserts a breach of contract claim against Saxon on the grounds that Saxon initiated foreclosure proceedings even though he claims he paid the December 2010 and January 2011 mortgage payments in accordance with the terms of the Repayment Agreement. (Doc. #1-2, ¶¶ 75-77.) To establish a breach of contract claim, a plaintiff must show: (1) the existence of a valid contract binding the parties in the action; (2) his own performance under the contract; (3) the defendant's nonperformance; and (4) damages. *Jones v. Alfa Mut. Ins. Co.*, 875 So. 2d 1189, 1195 (Ala. 2003). It is undisputed that the Repayment Agreement is a valid and binding contract. However, in this case, the undisputed evidence demonstrates that Carmichael can show neither his own performance under the Repayment Agreement nor Saxon's nonperformance.

7

Carmichael claims he made the December 2010 and January 2011 mortgage payments according to the terms of the Repayment Agreement. The Agreement required that payment must be received by Saxon on the first of the month and that payment had to be made by certified check or wire transfer. Although Carmichael's check #1322 is dated November 26, 2010, it was a personal check rather than a certified check, and it was not deposited into Saxon's wire clearing account until December 7, 2010. (Doc. #40, Ex. A, ¶ 10; Doc. #40, Ex. 2.) This, in and of itself, constitutes a breach by Carmichael of the Repayment Agreement, thereby giving Saxon the authority to "continue with the foreclosure action currently in place." (Doc. #40, Ex. 1.) In his response to Saxon's motion for summary judgment, Carmichael does not dispute that the personal check was deposited into Saxon's wire clearing account on December 7, 2010. Nor does he raise a waiver defense. The undisputed facts thus show that Carmichael breached the Repayment Agreement by failing to pay his December mortgage payment on or before December 1, 2010 and to pay it either by certified check or wire transfer. According to the terms of the Agreement, Saxon then had the right to continue with the foreclosure action that had previously been initiated.

It is irrelevant that Saxon rejected the funds sent on December 7, 2010, as a result of Carmichael depositing the check into the wire clearing account. Even if Carmichael had sent the money by traditional wire transfer on December 7, he would still have been in breach of the Repayment Agreement, and Saxon did not breach the Agreement by refusing to accept funds whose purpose it did not recognize. Nor did Saxon breach the Agreement by resuming foreclosure proceedings in January, since it had a right to do so under the terms of the Agreement as a result of Carmichael's late payment. It is also irrelevant whether Saxon was

8

justified in refusing payment on January 4, 2011, based on discrepancies between the name and address listed on the wire and the name and address on Carmichael's Saxon account because the January 4, 2011 wire transfer was late. Carmichael was already in breach of the Repayment Agreement, and Saxon had the right to refuse payment and resume the foreclosure under the terms of the Agreement. Since the undisputed facts establish that Carmichael was in breach of the Repayment Agreement and that Saxon accordingly had the right to resume foreclosure, summary judgment is due to be GRANTED in favor of Saxon on Carmichael's breach of contract claim as alleged in Count 4 of the complaint.

**B.      Wantonness (Count 3)**

Carmichael claims Saxon was wanton in accepting his December 2010 and January, 2011 payments but refusing to credit the payments to his account and continuing with the foreclosure on his home. (Doc. #1-2, ¶¶ 64–67.) Wantonness is the conscious performance of an act or the omission to perform a duty under the knowledge of existing conditions and conscious that such an act or omission will likely result in injury. *Gen. Motors Corp. v. Bell*, 714 So. 2d 268, 285–89 (Ala. 1996) (citations and internal quotations omitted). As the discussion of Carmichael's breach of contract claim establishes, Carmichael breached the Repayment Agreement when he failed to properly make his December 2010 and January 2011 mortgage payments, and Saxon had the right to continue the foreclosure proceeding at that point. Saxon did not consciously disregard its duty to credit Carmichael's mortgage payments to his account because the payments were not properly and timely made as required by the Repayment Agreement. Therefore, summary judgment is due to be GRANTED in Saxon's favor on Carmichael's wantonness claim as alleged in Count 3 of the complaint.

## C.     Negligence (Count 1)

Carmichael's negligence claim is based on Saxon's alleged failure to collect and to apply Carmichael's December 2010 and January 2011 payments to his account. (Doc. #1-2 ¶¶ 51-52, 63-66.) Even if Carmichael had produced evidence showing Saxon was somehow negligent in failing to accept his December 7, 2010 and January 4, 2011 payments, this would not amount to a viable cause of action because, as Saxon has correctly noted, there is no tort-like cause of action for negligently failing to perform a contract. A negligent failure to perform a contract is "but a breach of the contract." *Vines v. Crescent Transit Co.*, 85 So. 2d 436, 440 (Ala. 1955); *see also Barber v. Business Prods. Ctr.*, 677 So. 2d 223, 228 (Ala. 1996) ("[A] mere failure to perform a contractual obligation is not a tort.").

In order for Carmichael to state a cause of action for negligent failure to accept the wire transfers, he would have to establish that Saxon breached a duty of care it owed to him independent of its contractual obligations. *See Vines*, 85 So. 2d at 440. It is clear that Saxon's duty to accept payment from Carmichael and to properly credit those payments toward his account is a contractual obligation that Saxon, as servicer of Carmichael's loan, owed Carmichael under the terms of the Repayment Agreement. Thus, even if Carmichael produced evidence that Saxon improperly failed to accept the wire transfers from December 7 and January 4, which he has not, such action would amount to a breach of contract and not a tort. Therefore, Saxon's motion for summary judgment is due to be GRANTED as to Carmichael's negligence claim as alleged in Count 1 of his complaint.

## D.     Fraud (Count 2)

Carmichael alleges fraud based on Saxon "forcing" him into a repayment agreement

10

rather than a loan modification after his initial default in 2005 and knowingly misrepresenting to him that his account was not current after he attempted to make his December 2010 and January 2011 payments. (Doc. #1-2, ¶¶ 55-60; Doc. #40, Ex. B.) A plaintiff asserting fraud must establish: (1) a false representation by the defendant concerning an existing material fact; (2) a representation that (a) the defendant knew was false when it was made, (b) was made recklessly and without regard to its truth or falsity, or (c) was made by telling that plaintiff that the defendant had knowledge that the representation was true, when the defendant did not have such knowledge; (3) reliance by the plaintiff on the representation; (4) that the plaintiff's reliance was reasonable under the circumstances, and (5) damage proximately resulting from the plaintiff's reliance. *Bailey v. Rowan*, 751 So. 2d 504, 507 (Ala. 1999). Alternatively, a plaintiff may assert a claim for fraudulent suppression, which requires proof that: (1) the defendant had a duty to disclose material facts; (2) the defendant concealed or failed to disclose those facts; (3) the concealment or failure to disclose induced the plaintiff to act; and (4) the defendant's action resulted in harm to the plaintiff. *Boackle v. Bedwell Constr. Co.*, 770 So. 2d 1076 (Ala. 2000); s*ee also* Ala. Code §§ 6-5-101, 6-5-102. Summary judgment is due to be granted to Saxon on the claim for fraud because Carmichael failed to provide any proof that Saxon made a false representation to him or failed to disclose facts that it had a duty to disclose to him on which he detrimentally relied.

In response to Saxon's interrogatory asking Carmichael to state any facts Saxon misrepresented to him, Carmichael answered that he was told he had failed to make his December 2010 and January 2011 payments. (Doc. #40, Ex. B.) Carmichael also claimed

11

that Saxon "forced" him into a forbearance agreement. (Doc. #1-2, 55.) However, Carmichael has produced no evidence supporting these contentions. There is no evidence Carmichael was fraudulently "forced" into entering a forbearance agreement. Indeed, it is undisputed that Carmichael had defaulted on his mortgage with Saxon, and the Repayment Agreement, into which Carmichael voluntarily entered, allowed him to keep his house while making up for missed payments. As to Carmichael's claim that Saxon knowingly misrepresented that he failed to make his December 2010 and January 2011 payments, such statements by Saxon employees do not support a fraud claim because there is no evidence they were made with knowledge of or a reckless disregard for their truth.

It is undisputed that Carmichael's December 2010 and January 2011 payments were not credited to his account. The December 2010 payment was returned to Carmichael's account after Saxon was unable to determine the purpose of the payment since it was deposited into Saxon's wire clearing account. (Doc. #40, Ex. A, ¶ 12.) The January 2011 payment was similarly rejected by Saxon because it was unable to identify the payment due to differences between customer information on the wire and information in Carmichael's Saxon account. (Doc. #40, Ex. A, ¶ 13.) Thus, when Saxon employees told Carmichael he had not made his December 2010 and January 2011 payments, they were not making a knowing or reckless misrepresentation because the payments had not been identified as originating from Carmichael and, therefore, were not shown as having been paid towards and credited to his account. Further, Carmichael has not produced evidence showing that he relied on Saxon's representations that he had not made his December 2010 and January 2011 payments to his detriment. To the contrary, the undisputed evidence shows that Carmichael

12

immediately challenged Saxon's representations that he failed to make his December 2010 and January 2011 mortgage payments and faxed a formal dispute letter to Saxon the day after these representations were made to him. Based on the foregoing, summary judgment is due to be GRANTED in favor of Saxon on Carmichael's fraud claim as alleged in Count 2 of the complaint.

**E.     Slander of Title (Count 8)**

Carmichael alleges Saxon slandered his title to his property by wrongfully publishing a notice of foreclosure sale. (Doc. #1-2, ¶¶ 99-102.) The elements of a slander of title action are: (1) ownership of the property by the plaintiff; (2) falsity of the words published; (3) malice of defendant in publishing the false statements; (4) publication to some person other than the owner; (5) the publication must be in disparagement of plaintiff's property or the title thereof; and (6) that special damages were the proximate result of such publication. *Folmar v. Empire Fire & Marine Ins. Co.*, 856 So. 2d 807, 809 (Ala. 2003) (citations omitted). Carmichael has failed even to allege, much less produce evidence, that Saxon made statements that were false and malicious or disparaging of his property title. Under the terms of the Repayment Agreement, Carmichael acknowledged he was in default of his loan obligation and that the Repayment Agreement was "without prejudice to the Noteholder's right to exercise its power of sale or exercise any other rights and remedies." (Doc. #40, Ex. 1, ¶ 4.) Moreover, Carmichael failed to make his December 2010 and January 2011 payments according to the terms of the Repayment Agreement, and, therefore, Saxon had the right to continue foreclosure on his home. Accordingly, summary judgment is due to be GRANTED in favor of Saxon on Carmichael's slander of title claim as alleged in Count 8

of the complaint.

### F. Violation of the Alabama Deceptive Trade Practices Act (Count 10)

Carmichael alleges violation of the Alabama Deceptive Trade Practices Act and cites to the "catchall" provision in the Act, which prohibits engaging in any "unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(27). Carmichael bases this allegation on Saxon's alleged act of "wrongfully and deliberately" refusing to credit the December 2010 and January 2011 mortgage payments and "forcing" Carmichael into a forbearance agreement rather than a loan modification. (Doc. #1-2, ¶¶121–22.) The undisputed facts show that Carmichael's December 2010 payment was not timely and was not wrongfully refused by Saxon. There is no evidence that Saxon "forced" Carmichael into a forbearance agreement and no evidence it had a duty to give Carmichael a loan modification rather than a forbearance agreement after Carmichael defaulted on his loan. Therefore, summary judgment is due to be GRANTED to Saxon on Carmichael's Alabama Deceptive Trade Practices Act claim as alleged in Count 10 of the complaint.

### G. RESPA (Count 11)

Carmichael asserts a violation of the section of the Real Estate Settlement Procedures Act ("RESPA") that requires mortgage servicers to respond to Qualified Written Requests ("QWR") from mortgagors. *See* 12 U.S.C. § 2605(e). Carmichael claims his fax of January 12, 2011, disputing Saxon's claim that he had not made his December 2010 and January 2011 payments was a QWR to which Saxon did not properly respond. Saxon does not dispute that it was the servicer of Carmichael's loan and subject to RESPA. *See* 12 U.S.C.

§ 2605(i)(2).

RESPA requires servicers of "federally-related" mortgage loans to respond to QWRs. 12 U.S.C. § 2605(e)(1)(A). A QWR is a written request that: (1) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (2) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower. 12 U.S.C. § 2605(e)(1)(B). Carmichael's fax to Saxon on January 12, 2011, is a QWR under RESPA. It includes Carmichael's name and Saxon account number and specifically claims that Carmichael's account is in error because he "mailed" a check for his December 2010 payment and sent a wire transfer on January 3, 2011, but neither payment was credited to his account. (Doc. #42-1, 3.)

A mortgage servicer must provide a written response acknowledging receipt of the QWR within five days. 12 U.S.C. § 2605(e)(1)(A). Although the letter does not appear in the record, Carmichael alleges he received a letter from Saxon dated January 13, 2011, acknowledging his dispute letter that was faxed on January 12, 2011. (Doc. #1-2, ¶ 25.) Based on Carmichael's own allegations and admissions, Saxon complied with the requirement of § 2605(e)(1)(A).

However, not later than thirty days after receiving a QWR, a mortgage servicer must:

> **(A)** make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
>
> **(B)** after conducting an investigation, provide the borrower with

15

> a written explanation or clarification that includes–
>
>> **(i)** to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
>>
>> **(ii)** the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
>
> **(C)** after conducting an investigation, provide the borrower with a written explanation or clarification that includes–
>
>> **(i)** information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
>>
>> **(ii)** the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2). Aside from Carmichael's claim that Saxon acknowledged receipt of his QWR on January 13, 2011, there is no evidence in the record of a written explanation from Saxon addressing the December 2010 and January 2011 payments. There is a fax from Saxon dated March 31, 2011, accompanied with a copy of Carmichael's account statements, but this was made well after the thirty-day deadline required by RESPA. (Doc. #42-1, 18-25.) Even then, this document does not attempt to explain why Carmichael's December 2010 and January 2011 payments were not accepted or to provide evidence that Saxon had conducted an investigation in response to Carmichael's January 12 QWR.

      The Court finds that there is a genuine dispute of fact regarding whether Saxon violated RESPA. Specifically, the Court finds that a reasonable jury could conclude that Saxon failed to do the following within thirty days of receiving Carmichael's January 12, 2011 QWR: (1) conduct an investigation into the December 2010 and January 2011

16

payments; (2) provide a statement of reasons for which Saxon believed Carmichael's account was correct; and/or (3) provide a written explanation, including the information requested by Carmichael, or an explanation of why the information requested was unavailable or could not be obtained. *See* 12 U.S.C. § 2605(e)(2)(B)–(C). Based on the record before the Court, it appears that Saxon did not respond in writing to Carmichael's January 12, 2011 QWR as required by RESPA. It further appears that Saxon did not investigate and determine what happened to Carmichael's December 2010 and January 2011 payments until the middle of 2013, more than two years after Carmichael's QWR. (*See* Doc. #42-1, 26; Doc. #40, Ex. A, ¶¶ 8-13.)

Saxon contends that it complied with RESPA because there were no errors to correct, but it cites only 12 U.S.C. § 2605(k) for a prohibition against servicers "fail[ing] to take timely action to respond to a borrower's requests to correct errors." (Doc. #39, 25) (quoting 12 U.S.C. § 2605(k)(1)(C)). While that provision does prohibit servicers from failing to correct errors, Saxon fails to take into account 12 U.S.C. § 2605(e), which requires Saxon to provide written responses to QWRs within thirty days, even if the servicer has made no errors. While Carmichael does not cite 12 U.S.C. § 2605(e) in his opposition–indeed, Carmichael cites no law whatsoever in his opposition brief–he does allege violations of "12 U.S.C. § 2605(k) **and other provisions of RESPA**" in his complaint. (Doc. #1-2, ¶ 126) (emphasis added). Carmichael raises the argument that his January 12, 2011 fax was a QWR and that Saxon failed to respond to this QWR in accordance with the statute. (Doc. #42, 7.) Therefore, the record, taken as a whole, contains sufficient evidence that Saxon failed to respond to Carmichael's QWR and did not determine what happened to Carmichael's

17

December 2010 and January 2011 payments until two years later. *See Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) ("[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."). Saxon, as the moving party, bears the burden of proving that no genuine issue of material facts exist. *See O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). Saxon has failed to carry its burden on this claim, and summary judgment is therefore due to be DENIED as to Saxon's violation of RESPA as alleged in Count 11 of the complaint.

### H.     Defamation and Damage to Credit Reputation (Count 12)

Finally, Carmichael alleges Saxon damaged his credit reputation by advertising his home in a foreclosure sale and reporting his missed payments to credit agencies. (Doc. #1-2, ¶¶ 134-35.) The elements of a cause of action for defamation are: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence on the part of the defendant; (4) and either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. *McCaig v. Talladega Publ'g Co.*, 544 So. 2d 875, 877 (Ala. 1989). The evidence shows that Carmichael cannot establish the first element of defamation, *i.e.* a false and defamatory statement. The publication of the foreclosure sale was not false or defamatory because Carmichael was in default of his loan and the Repayment Agreement did not waive Saxon's right to exercise the power of sale or to continue with foreclosure in the event of a breach. (Ex. 1, Doc. #40 , ¶ 4.) The published notice of Carmichael's default was also not false and defamatory because the late December 2010 payment breached the Repayment Agreement and triggered a default. Summary

judgment is, therefore, due to be GRANTED to Saxon on Count 12 of the complaint.

## V. CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1. Defendant's Motion for Summary Judgment (Doc. #38) is GRANTED as to Counts 1 through 10 and Count 12 of Plaintiff's Complaint, and these claims are DISMISSED WITH PREJUDICE; and

2. Defendant's Motion for Summary Judgment (Doc. #38) is DENIED as to Count 11 of Plaintiff's Complaint.

DONE this the 6th day of September, 2013.

                                              /s/ Mark E. Fuller
                                      UNITED STATES DISTRICT JUDGE